3 U.S. 54 (____)
3 Dall. 54
PENHALLOW, et al.
versus
DOANE'S Administrators.
Supreme Court of United States.

*79 On the 24th of Feb. 1795, the Judges delivered their opinions seriatim.
PATERSON, Justice:
This cause has been much obscured by the irregularity of the pleadings, which present a medley of procedure, partly according to the common, and partly according to the civil, law. We must endeavour to extract a state of the case from the Record, Documents, and Acts, which have been exhibited.
[Here the Judge delivered the historical narrative of the cause, with which this report is introduced, and then proceeded as follows:]
PATERSON, Justice.
I have been particular in stating the case, and giving an historical narrative of the transaction, in order that the grounds of decision may be fully understood. The pleadings consist of a heap of materials, thrown together in an irregular manner, and, if examined by the strict rules of common law, cannot stand the test of legal criticism. We are, however, to view the proceedings as before a Court of Admiralty, which is not governed by the rigid principles of common law. Order and systematic arrangement are no small beauties in juridical proceedings; and, whatever may be said to the contrary, it will, on fair investigation, appear, that good pleading is founded on sound logic, and good sense.
In the discussion of the cause, several questions have been agitated; some of which, involving constitutional points, are of great importance.
The jurisdiction of the Commissioners of Appeals has been questioned.
*80 The jurisdiction of the Court of Appeals has been questioned.
These jurisdictions turning on the competency of Congress, it has been questioned, whether that body had authority to institute such tribunals.
And, lastly, the jurisdiction of the District Court of New Hampshire has been questioned. In every step we take, the point of jurisdiction meets us.
I. The question first in order, is, whether the Commissioners of Appeals had jurisdiction, or, in other words, whether Congress, before the ratification of the articles of confederation, had authority to institute such a tribunal, with appellate jurisdiction in cases of prize?
Much has been said respecting the powers of Congress. On this part of the subject the counsel on both sides displayed great ingenuity, and erudition, and that too in a stile of eloquence equal to the magnitude of the question. The powers of Congress were revolutionary in their nature, arising out of events, adequate to every national emergency, and co-extensive with the object to be attained. Congress was the general, supreme, and controuling council of the nation, the centre of union, the centre of force, and the sun of the political system. To determine what their powers were, we must enquire what powers they exercised. Congress raised armies, fitted out a navy, and prescribed rules for their government: Congress conducted all military operations both by land and sea: Congress emitted bills of credit, received and sent ambassadors, and made treaties: Congress commissioned privateers to cruize against the enemy, directed what vessels should be liable to capture, and prescribed rules for the distribution of prizes. These high acts of sovereignty were submitted to, acquiesced in, and approved of, by the people of America. In Congress were vested, because by Congress were exercised with the approbation of the people, the rights and powers of war and peace. In every government, whether it consists of many states, or of a few, or whether it be of a federal or consolidated nature, there must be a supreme power or will; the rights of war and peace are component parts of this supremacy, and incidental thereto is the question of prize. The question of prize grows out of the nature of the thing. If it be asked, in whom, during our revolution war, was lodged, and by whom was exercised this supreme authority? No one will hesitate for an answer. It was lodged in, and exercised by, Congress; it was there, or no where; the states individually did not, and, with safety, could not exercise it. Disastrous would have been the issue of the contest, if the States, separately, had exercised the powers of war. For, in such case, there would have been as many supreme *81 wills as there were states, and as many wars as there were wills. Happily, however, for America, this was not the case; there was but one war, and one sovereign will to conduct it. The danger being imminent, and common, it became necessary for the people or colonies to coalesce and act in concert, in order to divert, or break, the violence of the gathering storm; they accordingly grew into union, and formed one great political body, of which Congress was the directing principle and soul. As to war and peace, and their necessary incidents, Congress, by the unanimous voice of the people, exercised exclusive jurisdiction, and stood, like Jove, amidst the deities of old, paramount, and supreme. The truth is, that the States, individually, were not known nor recognized as sovereign, by foreign nations, nor are they now; the States collectively, under Congress, as the connecting point, or head, were acknowledged by foreign powers as sovereign, particularly in that acceptation of the term, which is applicable to all great national concerns, and in the exercise of which other sovereigns would be more immediately interested; such, for instance, as the rights of war and peace, of making treaties, and sending and receiving ambassadors. Besides, every body must be amenable to the authority under which he acts. If he accept from Congress a commission to cruize against the enemy, he must be responsible to them for his conduct. If, under colour of such commission, he had violated the law of nations, Congress would have been called upon to make atonement and redress. The persons who exercise the right or authority of commissioning privateers, must, of course, have the right or authority of examining into the conduct of the officer acting under such commission, and of confirming or annulling his transactions and deeds. In the present case, the Captain of the M'Clary obtained his commission from Congress; under that commission he cruised on the high seas, and captured the Susanna; and for the legality of that capture he must ultimately be responsible to Congress, or their constituted authority. This results from the nature of the thing; and, besides, was expressly stipulated on the part of Congress. The authority exercised by Congress in granting commissions to privateers, was approved and ratified by the several colonies or states, because they received and filled up the commissions and bonds, and returned the latter to Congress  New-Hampshire did so, as well as the rest.
Another circumstance, worthy of notice, is the conduct of New-Hampshire, by her Delegate in Congress, in the case of the sloop Active. Acts of Congress, 6th March, 1779.  By this decision, New-Hampshire concurred in binding the other states. Did she not also bind herself? Before the articles of confederation were ratified, or even formed, a league of some kind subsisted *82 among the states; and, whether that league originated in compact, or a sort of tacit consent, resulting from their situation, the exigencies of the times, and the nature of the warfare, or from all combined, is utterly immaterial. The States, when in Congress, stood on the floor of equality; and, until otherwise stipulated, the majority of them must controul. In such a confederacy, for a state to bind others, and not, in similar cases, be bound herself, is a solecism. Still, however, it is contended, that New-Hampshire was not bound, nor Congress sovereign as to war and peace, and their incidents, because they resisted this supremacy in the case of the Susanna. But I am, notwithstanding, of opinion, that New-Hampshire was bound, and Congress supreme, for the reasons already assigned, and that the continued to be bound, because she continued in the confederacy. As long as she continued to be one of the federal states, it must have been on equal terms. If the would not submit to the exercise of the act of sovereignty contended for by Congress, and the other states, she should have withdrawn herself from the confederacy.
In the Resolutions of Congress of the 6th of March, 1779, is contained a course of reasoning, which, in my opinion, is cogent and conclusive. 5 Jour. Cong. 86, 87, 88, 89, 90.
"The committee, consisting of Mr. Floyd, Mr. Ellery, and Mr. Burke, to whom was referred the report of the committee on appeals of January 19th, 1779, having, in pursuance of the instructions to them given, examined into the causes of the refusal of the Judge of the Court of Admiralty for the State of Pennsylvania, to carry into execution the decree of the Court or committee of appeals, report,
"That on a libel in the court of admiralty for the state of Pennsylvania in the case of the sleep Active, the jury found a verdict in the following words, viz. "one fourth of the nett proceeds of the sloop Active and her cargo to the first claimants, three fourths of the nett proceeds of the said sloop and her cargo to the libellant and the second claimant, as per agreement between them; which verdict was confirmed by the judge of the court, and sentence passed thereon. From this sentence or judgment and verdict, an appeal was lodged with the secretary of Congress, and referred to the committee appointed by Congress "to hear and determine finally upon all appeals brought to Congress," from the Courts of Admiralty of the several States:
"That the said committee, after solemn argument and full hearing of the parties by their advocates, and taking time to consider thereof, proceeded to the publication of their definitive sentence or decree, thereby reversing the sentence of the Court of Admiralty, making a new decree, and ordering process to *83 issue out of the Court of Admiralty for the state of Pennsylvania to carry this their decree into execution:
"That the judge of the Court of Admiralty refused to carry into execution the decree of the said committee on appeals, and has assigned as the reason of his refusal, that an act of the Legislature of the said State has declared, that the finding of a jury shall establish the facts in all trials in the Courts of Admiralty, without re-examination or appeal, and that an appeal is permitted only from the decree of the judge:
"That having examined the said act, which is entitled, "an act for establishing a Court of Admiralty," passed at a session which commenced on the 4th of August, 1778, the committee find the following words, viz. "the finding of a jury shall establish the facts, without re-examination, or appeal," and in the seventh section of the same act the following words, viz. "in all cases of captures an appeal from the decree of the Judge of Admiralty of this State, shall be allowed to the Continental Congress, or such person or persons as they may from time to time appoint for hearing and trying appeals."
"That although Congress, by their resolution of November 25th, 1775, recommended it to the several legislatures, to erect courts for the purpose of determining concerning captures, and to provide that all trials in such cases be had by a jury, yet it is provided, that in all cases an appeal shall be allowed to Congress, or to such person or persons as they shall appoint for the trial of appeals:" whereupon,
"Resolved, That Congress, or such person or persons as they appoint, to hear and determine appeals from the courts of Admiralty, have necessarily the power to examine as well into decisions on facts as decisions on the law, and to decree finally thereon, and that no finding of a jury in any court of Admiralty, or court for determining the legality of captures on the high seas, can or ought to destroy the right of appeal, and the re-examination of the facts reserved to Congress:
"That no act of any one state can or ought to destroy the right of appeals to Congress, in the sense above declared:
"That Congress is by these United States, invested with the supreme sovereign power of war and peace:
"That the power of executing the law of nations is essential to the sovereign supreme power of war and peace:
"That the legality of all captures on the high seas must be determined by the law of nations:
"That the authority ultimately and finally to decide on all matters and questions touching the law of nations, does reside and is vested in the sovereign supreme power of war and peace:
*84 "That a controul by appeal is necessary, in order to compel a just and uniform execution of the law of nations.
"That the said controul must extend as well over the decisions of juries, as judges, in courts for determining the legality of captures on the sea; otherwise the juries would be possessed of the ultimate supreme power of executing the law of nations in all cases of captures, and might, at any time, exercise the same in such manner, as to prevent a possibility of being controuled; a construction which involves many inconveniences and absurdities, destroys an essential part of the power of war and peace entrusted to Congress, and would disable the Congress of the United States, from giving satisfaction to foreign nations complaining of a violation of neutralities, of treaties, or other breaches of the law of nations, and would enable a jury, in any one state, to involve the United States in hostilities; a construction, which for these and many other reasons, is inadmissible:
"That this power of controuling by appeal, the several admiralty jurisdictions of the States, has hitherto been exercised by Congress, by the medium of a committee of their own members:
"Resolved, That the committee before whom was determined the appeal from the court of Admiralty for the State of Pennsylvania, in the case of the sloop Active, was duly constituted and authorised to determine the same:"
The yeas and nays being taken, it appears that the States of New-Hampshire, Massachusetts-Bay, Rhode-Island, Connecticut, New-York, Maryland, Virginia, North-Carolina, South-Carolina, and Georgia, voted unanimously in the affirmative: the State of Pennsylvania unanimously in the negative; and Mr. Witherspoon, who was alone from New-Jersey, voted also in the negative.
The Congress then voted as follows, viz.
"Resolved, That the said committee had competent jurisdiction to make thereon a final decree, and therefore their decree ought to be carried into execution."
The yeas and nays being taken on this resolution, it appears, that New-Hampshire, Massachusetts-Bay, Rhode-Island, Connecticut, New-York, Maryland, Virginia, North-Carolina, South-Carolina, and Georgia, voted unanimously in the affirmative; Pennsylvania unanimously in the negative; and Mr. Witherspoon, who was alone from New-Jersey, voted on this occasion in the affirmative.
The Congress then resolved as follows, viz.
"Resolved, That the General Assembly of the State of Pennsylvania, be requested to appoint a committee, to confer with a committee of Congress, on the subject of the proceedings *85 relative to the sloop Active, and the objections made to the execution of the decree of the committee on appeals, to the end that proper measures may be adopted for removing the said obstacles; and that a committee of three be appointed to hold the said conference, with the committee of the General Assembly of Pennsylvania:
"The members chosen, Mr. Paca, Mr. Burke, and Mr. R.H. Lee."
I shall close this head of discourse with observing, that it is with diffidence I have ventured to give an opinion on a questien so novel and intricate, and respecting which, men, eminent for their talents, their literary attainments, and skill in jurisprudence, have been divided in sentiment. The opinion, however, which has been given, is the result of conviction; if wrong, it is the error of the head, and as such will carry its apology with it.
II. Whether, after the articles of consederation were ratified, the Court of Appeals had jurisdiction of the subject matter?
However problematical the opinion, which has been delivered on the preceding point, may be, I apprehend, that little doubt or difficulty can arise on the present question. By the 9th article of the Consederation, the United States, in Congress assembled, are vested, among other things, with the sole and exclusive power of establishing rules for deciding in all cases, what captures on land or water shall be legal, and in what manner prizes, taken by land or naval forces in the service of the United States, shall be divided or appropriated; of granting letters of marque and reprisal in times of peace; appointing courts for the trial of piracies and felonies committed on the high seas, and establishing courts for receiving and determining finally, appeals in all cases of captures.
The Court of Appeals, in September 1783, decided upon the point of jurisdiction either directly, or incidentally; for, after a full hearing, they decreed that the sentences passed by the Superior and Inferior Courts of New-Hampshire should be reversed and annulled, and the property be restored. This decree being made by a court, constitutionally established, of competent authority, and the highest jurisdiction, is conclusive and final. It cannot be opened and investigated; for, neither this court, nor any other, can, in a collateral way, review the proceedings of a tribunal, which had jurisdiction of the subject-matter. The Court of Appeals was competent to the decision; they have adjudicated as well on the jurisdiction as the merits of the cause, and we must suppose that they have acted properly. This also is an answer as to irregularities, if any there were, which may have taken place in the proceedings *86 before the Court of Appeals, or in the mode of removing the cause before them. This court cannot take notice of irregularities in the proceedings, or error in the decision, of the Court of Appeals. The question is at rest; it ought not to be again disturbed.
III. Whether the District Court of New-Hampshire had jurisdiction; or, in other words, whether the libel exhibited before that court, was the proper remedy, or mode of carrying into execution, either specifically, or by way of damages, the decree of the Court of Appeals?
On this point I entertain no doubts. Recurrence to facts will answer the question. The existence of the Court of Appeals terminated with the old government; this also was the case with the subordinate Court of Admiralty in the State of New-Hampshire. The property was not restored to the libellants, nor were they compensated in damages; of course the decree in their favour remains unsatisfied. They had no remedy at common law; they had none in equity; the only forum competent to give redress is the District Court of New-Hampshire, because it has admiralty jurisdiction. There they applied, and, in my opinion, with great propriety.
Judges may die, and courts be at an end; but justice still lives, and, though she may sleep for a while, will eventually awake, and must be satisfied.
Having discussed the preliminary questions relative to jurisdiction, we shall now consider the proceedings in the Circuit Court of New-Hampshire. And here the first question is, whether by the death of Elisha Doane, before the judgment rendered in the court of appeals, that judgment is not avoided? The death of Doane does not appear on the record of the proceedings before the court of appeals; it is in evidence from the certificate of the judge of probates, which is annexed to the record transmitted from the Circuit Court of New-Hampshire. Many answers have been given to this question; some of which are cogent as well as plausible. On this subject, it will be sufficient to observe, that admitting the death of Doane, and that it can be taken notice of in this court, it is unavailing, because the proceedings in a court of admiralty are in rem. The sentence of a court of admiralty, or of appeal in questions of prize, binds all the world, as to every thing contained in it, because all the world are parties to it. The sentence, so far as it goes, is conclusive to all persons.
The most formidable objections have been levelled against the damages.
1. It is said, that the damages ought not to have been given, because they were not prayed. The answer to this objection *87 is satisfactory  the prayer is for general relief, and therefore sufficient.
2. If any damages ought to be given, yet none ought to have been awarded against George Wentworth, because he was an agent, and paid the money over under the decree of the Court of New Hampshire.
If any Agent pay over, after notice, he pays wrongfully, and shall not be excused. In this case George Wentworth was a party to the suit, he appeared as one of the Libellants, and must be liable to all the legal consequences resulting from such a situation. As a party, he was before the court, and privy to the appeal, which was made in due season. The appeal did, from the moment it was made, suspend the execution of the decree, and that whether it was received or not;[*] especially in cases like the present, where George Wentworth was a party to the suit, before the court, and had notice of its having been tendered or made. In such a predicament, he ought not to have paid over; but should have awaited the ultimate decision of the Court of Appeals. If he paid, it was at his peril; he took the risk upon himself, and in case of undue payment, became liable.
It has been said, that an inhibition should have been issued, and that without it the appeal did not suspend the execution of the decree. The writ of inhibition is a proper and necessary writ, not because it suspends the effect of the decree, for that is already done by the appeal; but because it enables the court of appellate jurisdiction, in case of disobedience, to punish the inferior court as being in contempt. The appeal has not this effect, because it is the act of the party, and not of the superior court.
A monition, it is said, ought to have been addressed to the Appellees to enforce their appearance before the Court of appellate jurisdiction. The answer is, that George Wentworth, as well as the others, did appear both before the Court of Commissioners and the Court of Appeals. If a defect, and inquirable into by this court, it is cured by appearance.
In short, George Wentworth was a party to the suit, present in court, and had notice of the appeal. If, in such a situation, he undertook to distribute the proceeds, it was at his own risk: and in case of reversal, he made himself liable.
I have doubts how far the court below could inquire into the question of agency and payment over, especially as the payment is said to have been made, previously to the argument before the Court of Appeals, or even the Court of Commissioners. The decree is for restoration. If the Court of Appeals had issued process to carry their definitive sentence into effect, or *88 had directed the Maritime Courts of New Hampshire to have done so, would it, in the instance of George Wentworth, have been a legal justification to have said, that he had delivered the property, or paid its proceeds, to the captors? Besides, whatever could have been brought forward, by way of defence, in the Court of Appeals, ought there to have been urged and relied upon; and if the party has omitted to do so, he has slipt his opportunity, and is precluded from taking advantage thereof in future.
I know, that a distinction is made between foreign and domestic judgments; that the latter are conclusive, whereas the former are liable to investigation. Be it so. But is the principle, upon which this distinction is founded, applicable to decrees, on questions of prize, in the highest Court of Admiralty, which, in such cases, is guided by the law of Nations, and not municipal regulations? If it is, it must be under very special circumstances.
3. It is objected, that the damages awarded are joint; whereas they ought to have been several. This objection is a found one. But as the facts are spread on the record, it is in the power of the court to sever the damages, and so to apportion them as to effectuate substantial justice. The damages should have pursued and been admeasured by the original decree, which directed, that one moiety of the proceeds should be paid to the owners, and the other to the captors. George Wentworth received a moiety only; he is liable for that, and no more.
4. Another objection is, that interest has been calculated from a wrong period, to wit, from the 2d October, 1778; and therefore the decree of the Circuit Court is erroneous.
The Court of Appeals pronounced their definitive sentence in September 1783; by which the judgments of the inferior and superior Courts of New Hampshire were reversed, and restoration decreed; they also directed, that the parties should pay their own costs. I am of opinion, that interest should have been computed from the day, on which the definitive sentence of the Court of Appeals was pronounced. Of this there can be no doubt with respect to John Penhallow and the owners. Some doubts, however, have been entertained on this point with regard to George Wentworth. But for the reasons, which have been assigned, he must be considered in the same situation as the others.
Arguments, deducible from the hardship of the case, have been advanced and insisted upon. It is hard, that George Wentworth, who was an agent, should be made personally responsible. It is cruel, that George Wentworth should be cut down by the collision of conflicting jurisdictions. But motives of commiseration, from whatever source they flow, must not *89 mingle in the administration of justice. Judges, in the exercise of their functions, have frequent occasions to exclaim, "durum valde durum, sed sic lex est."

 To conclude, the sum of - - - £.5,895 14 10
 appears, on the record, to be the aggregate
 value of the Susanna, her cargo, &c.
 On this sum interest should be calculated
 from 17th September, 1783, till 24th October,
 1794, which will amount to - - - 3,920 13 4
 _____________
 Making in the whole - - - - £.9,816 8 2

Equal to 32,721 dollars and 36 cents. The one moiety whereof, being 16,360 dollars and 68 cents, I am of opinion, should be paid by John Penhallow and the owners, and the other moiety by George Wentworth. The costs in the courts below should be divided in the same manner.
I am also of opinion, that the parties should bear their respective costs, which have arisen on the prosecution of the appeal in this court.
IREDELL, Justice.
This case, which is of so much novelty and importance, has been argued at the bar with very great ability on both sides. I have listened with the most respectful attention to every thing that has been said upon it, and the opinion, which I am now to deliver, is the result of the best consideration which I have been able to bestow on the subject.
The order in which it has appeared to me most convenient to arrange the different heads of enquiry is as follows:
1. Whether either of the decrees of June, 1779, or September, 1783, was originally valid?
2. If either of them was so, whether it was a decree which the District Court of New Hampshire, or the Circuit Court of New Hampshire, acting specially in this cause for the legal reason alledged, had authority to enforce, either by decreeing a specific execution, or awarding damages for a non-performance of it?
3. Whether, if the District or Circuit Court had such an authority, it has been executed properly in this instance, under all the circumstances of the case?
4. Whether, in case the Libellants were entitled to a decree in their favour, but it shall appear that the decree has been erroneous in respect to the relief given, either in the whole or in part, this court can rectify the decree, or order it to be rectified by the court below, or must affirm or reverse in the whole?
Under the first head it will be proper previously to consider if either of the decrees was final and conclusive, because if that point should be decided in the affirmative, it will render *90 unnecessary a decision of many important questions that otherwise arise in this cause. This previous point, however, cannot be decided on satisfactory principles, without in some measure tracing the origin of the general powers of Congress, from the time of the earliest exercise of their authority, to the period when definite and express powers were solemnly and formally given to them by the articles of confederation. I shall therefore make a few preliminary observations on this subject, though I by no means think it material to go into a full detail.
Under the British government, and before the opposition to the measures of the Parliament of Great Britain became necessary, each Province in America composed (as I conceive) a body politic, and the several Provinces were no otherwise connected with each other, than as being subject to the same common sovereign. Each Province had a distinct legislature, a distinct executive (subordinate to the king) a distinct judiciary and in particular the claim as to taxation, which began the contest, extended to a separate claim of each province to raise taxes within itself; no power then existed, or was claimed, for any joint authority on behalf of all the Provinces to tax the whole. There were some disputes as to boundaries, whether certain lands were within the bounds of one Province or another, but nobody denied that where the boundaries of any one Province could be ascertained, all the permanent inhabitants within those boundaries were members of the body politic, and subject to all the laws of it. When acts were passed by the Parliament of Great Britain which were thought unconstitutional and unjust, and when every hope of redress by separate applications appeared desperate, then was conceived the noble idea, which laid the foundation of the present independence and happiness of this country, (though independence was not then in contemplation) of forming a common council to consult for the common welfare of the whole, so far as an opposition to the measures of Great Britain was concerned. In order to compose this common council each Province chose for itself, in its own way, and by its own authority, without any previous concerted plan of the whole, deputies to attend at a general meeting to be held in this city. Some appointed by their Assemblies; others by Conventions; some perhaps in other modes; but, in whatever way the appointment was made, it was notoriously done with the hearty consent and approbation of the great body of the people in each Province, and therefore the appointment was unexceptionable to all those who thought the opposition just, and a union of the whole in the measures of opposition necessary. Each Province even appointed as many or as few deputies as it pleased, at its own discretion, which was not objected to, because the Members of Congress did not *91 vote individually, but the votes given in Congress were by Provinces, as they afterwards were (subsequent to the declaration of Independence, and until the present constitution of the United States was formed) by States.
The powers of Congress at first were indeed little more than advisory; but, in proportion as the danger increased, their powers were gradually enlarged, either by express grant, or by implication arising from a kind of indefinite authority, suited to the unknown exigencies that might arise. That an undefined authority is dangerous, and ought to be entrusted as cautiously as possible, every man must admit, and none could take more pains, than Congress for a long time did, to get their authority regularly defined by a ratification of the articles of confederation. But that previously thereto they did exercise, with the acquiescence of the States, high powers of what I may, perhaps, with propriety for distinction, call external sovereignty, is unquestionable. Among numerous instances that might be given of this, (and which were recited very minutely at the bar) were the treaties of France in 1778, which no friend to his country at the time questioned in point of authority, nor has been capable of reflecting upon since without gratitude and satisfaction. Whether among these powers comprehended within their general authority, was that of instituting courts for the trial of all prize causes, was a great and awful question; a question that demanded deep consideration, and not perhaps susceptible of an easy decision. That in point of prudence and propriety it was a power most sit for Congress to exercise, I have no doubt. I think all prize causes whatsoever ought to belong to the national sovereignty. They are to be determined by the law of nations. A prize court is, in effect, a court of all the nations in the world, because all persons, in every part of the world, are concluded by its sentences, in cases clearly coming within its jurisdiction. Even in the case of citizen and citizen I do not think it a proper subject for mere municipal regulation, because as was observed at the bar, a citizen may make a colourable claim, which the court may not be able to detect, and yet a foreigner be fatally injured by it. In case of a bona fide claim, it may appear to be good by the proofs offered to the court, but another person living at a distance may have a superior claim, which he has no opportunity to exhibit. It is true a general monition issues, and this is considered notice to all the world, but though this be the construction of the law from the necessity of the case, it would be absurd to infer in fact that all the world had actual notice, and therefore no superior claimant to the one before the court could possibly exist. The court, therefore, can never know with certainty whether citizens only are interested in the enquiry. But the words *92 "citizen and citizen" in this case are very ill applied to the parties in question, they not having been citizens of the same State, the captors having been citizens of New Hampshire, and the claimant a citizen of Massachusetts-Bay. It never was considered that before the actual signature of the articles of confederation a citizen of one State was to any one purpose a citizen of another. He was to all substantial purposes as a Foreigner to their forensic jurisprudence. If rigorous law had been enforced, perhaps he might have been deemed an alien, without an express provision of the State to save him. And as an unjust decision upon the law of nations, in the case of a Foreigner to all the States, might, if redress had not been given, have ultimately led to a foreign war, an unjust decision on the same law in one State, to the prejudice of a citizen of another State, might have ultimately led, if redress had not been given, to a civil war, an evil much the more dreadful of the two. I have made these observations merely as to the propriety that this power should have been delegated, and therefore to shew that if it was assumed without adequate authority, it was not an arbitrary and unnatural assumption of a power, that ought exclusively to belong to a single State; but by no means with a view to argue, that because it was proper to be given, therefore it was actually given, a position which, as it would lead to dangerous and inadmissible consequences, cannot be the ground of a legitimate argument.
Some of the arguments at the bar, if pushed to an extreme, would tend to establish, that Congress had unlimited power to act at their discretion, so far as the purposes of the war might require; and it was even said, that the Jus Belli never was in any one of the States, and therefore it could not be delegated by any State to Congress. My principles on this subject are totally different from those which were the foundation of this opinion, and as it is a point of no small importance, and I find on this occasion, as I have formerly done on others, considerable mistakes (as I conceive) by very able men, owing to a misapprehension of terms, I will endeavour to state my own principles on the subject with so much clearness, that whether my opinion be right or wrong, it may at least be understood what the opinion really is.
If Congress, previous to the articles of confederation, possessed any authority, it was an authority, as I have shewn, derived from the people of each Province in the first instance. When the obnoxious acts of Parliament passed, if the people in each Province had chosen to resist separately, they undoubtedly had equal right to do so, as to join in general measures of resistance with the people of the other Provinces, however unwise and destructive such a policy might, and undoubtedly *93 would have been. If they had pursued this separate system, and afterwards the people of each Province had resolved that such Province should be a free and independent State, the State from that moment would have become possessed of all the powers of sovereignty internal and external, (viz. the exclusive right of providing for their own government, and regulating their intercourse with foreign nations) as completely as any one of the ancient Kingdoms or Republics of the world, which never yet had formed, or thought of forming, any sort of Federal union whatever. A distinction was taken at the bar between a state and the people of the state. It is a distinction I am not capable of comprehending. By a State forming a Republic (speaking of it as a moral person) I do not mean the Legislature of the State, the Executive of the State, or the Judiciary, but all the citizens which compose that State, and are, if I may so express myself, integral parts of it; all together forming a body politic. The great distinction between Monarchies and Republics (at least our Republics) in general is, that in the former the monarch is considered as the sovereign, and each individual of his nation as subject to him, though in some countries with many important special limitations: This, I say, is generally the case, for it has not been so universally. But in a Republic, all the citizens, as such, are equal, and no citizen can rightfully exercise any authority over another, but in virtue of a power constitutionally given by the whole community, and such authority when exercised, is in effect an act of the whole community which forms such body politic. In such governments, therefore, the sovereignty resides in the great body of the people, but it resides in them not as so many distinct individuals, but in their politic capacity only. Thus A.B.C. and D. citizens of Pennsylvania, and as such, together with all the citizens of Pennsylvania, share in the sovereignty of the State. Suppose a State to consist exactly of the number of 100,000 citizens, and it were practicable for all of them to assemble at one time and in one place, and that 99,999 did actually assemble: The State would not be in fact assembled. Why? Because the state in fact is composed of all the citizens, not of a part only, however large that part may be, and one is wanting. In the same manner as 99l. is not a hundred, because one pound is wanting to complete the full sum. But as such exactness in human affairs cannot take place, as the world would be at an end, or involved in universal massacre and confusion, if entire unanimity from every society was required; as the assembling in large numbers, if practicable as to the actual meeting of all the citizens, or even a considerable part of them, could be productive of no rational result, because there could be no general debate, no consultation of the whole, nor *94 of consequence a determination grounded on reason and reflexion, and a deliberate view of all the circumstances necessary to be taken into consideration, mankind have long practised (except where special exceptions have been solemnly adopted) upon the principle, that the majority shall bind the whole, and in large countries, at least, that representatives shall be chosen to act on the part of the whole. But when they do so, they decide for the whole, and not for themselves only. Thus, when the legislature of any state passes a bill by a majority, competent to bind the whole, it is an act of the whole Assembly, not of the majority merely. So when this court gives a judgment by the opinion of a majority, it is the judgment, in a legal sense, of the whole court. So I conceive, when any law is passed in any state, in pursuance of constitutional authority, it is a law of the whole state acting in its legislative capacity; as are, also, executive and judiciary acts constitutionally authorised, acts of the whole state in its executive or judiciary capacity, and not the personal acts alone of the individuals, composing those branches of government. The same principles apply as to legislative, executive, or judicial acts of the United States, which are acts of the people of the United States, in those respective capacities, as the former are of the people of a single state. These principles have long been familiar in regard to the exercise of a constitutional power as to treaties. These are deemed the treaties of the two nations, not of the persons only, whole authority was actually employed in their formation. There is not one principle that I can imagine which gives such an effect as to treaties, that has not such an operation on any other legitimate act of government, all powers being equally derived from the same fountain, all held equally in trust, and all, when rightfully exercised, equally binding upon those from whom the authority was derived.
I conclude, therefore, that every particle of authority which originally resided either in Congress, or in any branch of the state governments, was derived from the people who were permanent inhabitants of each province in the first instance, and afterwards became citizens of each state; that this authority was conveyed by each body politic separately, and not by all the people in the several provinces, or states, jointly, and of course, that no authority could be conveyed to the whole, but that which previously was possessed by the several parts; that the distinction between a state and the people of a state has in this respect no foundation, each expression in substance meaning the same thing; consequently, that one ground of argument at the bar, tending to shew the superior sovereignty of Congress, in the instance in question, was not tenable, and therefore that upon that ground the exercise of the authority in question can not be supported.
*95 I have already, however, stated my opinion, that from the nature of our political situation, it was highly reasonable and proper that Congress should be possessed of such an authority, and this is a consideration of no small weight to induce an inference, that they actually possessed it when their powers were so indifinite, and when it seems to have been the sense of all the states, that Congress should possess all the incidents to external sovereignty, or, in other words, the power of war and peace, so far as other nations were concerned, though the states in some particulars differed, as to the construction of the general powers given for that purpose. Two principles appear to me to be clear. 1. The authority was not possessed by Congress, unless given by all the states. 2. If once given, no state could, by any act of its own, disavow and recall the authority previously given, without withdrawing from the confederation. In the case of the Active, ten states out of twelve recognized the authority, New-Hampshire voting in support of it. This was in 1779, long after the act of New-Hampshire was passed, which has given occasion to the controversy in this cause, and in the same year when the second act of New-Hampshire was passed, which allowed an appeal to Congress in cases (as the act expressed it) "wherein any subject or "subjects of any foreign nation or state, in amity with this "and the United States of America, should in due form of law, "claim the whole, or any part of the vessel and cargo in dispute." The resolution of Congress was dated the 6th March, 1779; the act of New-Hampshire in November following. The vote of the delegates of New-Hampshire, in the case of the Active, would not, indeed, be equivalent to a clear grant of the power, but it is a respectable support of the construction contended for by the defendants in error. It has been properly observed, that a court cannot by its own decision, give itself jurisdiction where it had none before; but if courts are so constituted that one is necessarily superior to another, the decision of the superior must, to be sure, prevail. This, perhaps, is not conclusive as to the court of commissioners, because it cannot be decided whether it was in fact the superior court in respect to New-Hampshire, without deciding whether it was constitutionally so in virtue of power from all the states. This point it would be now necessary for this court to decide, if it were not for the decision of the court of appeals in 1783, a court of acknowledged prize jurisdiction, established in virtue of express authority from all the states (New-Hampshire included) and made a court in the last resort as to all prize causes, or in other words (as expressed in the article of confederation itself) in all cases of captures. And the decision of this court on the subject of the two contending jurisdictions, I *96 consider to be final and conclusive, for the following reasons.
1. At the time the decision was given, it was the only court of final appellate jurisdiction, as to cases of captures, in the United States. It seems therefore to follow necessarily, that upon all questions of capture their decision should be final and conclusive, as much as the decision of this Court upon a writ of error from the Circuit Court, or any other branch of its jurisdiction, would be so.
2. To the suggestion at the bar, that the Court of appeals could have no retrospect, several answers, I conceive, may be given.
1. It is taking for granted the very point in dispute, that this decision was retrospective. If Congress possessed this authority before, and the articles of Confederation amounted only to a solemn confirmation of it, it was in no manner retrospective. It was in effect a continuance of the same court acting under an express, instead (as before) of acting under an implied authority, and allowing the full benefit of an appeal regularly prayed, and rightfully enforced by the superior tribunal, after an unwarranted dissallowance by the inferior.
2. Whether the article in the confederation giving authority to this court as a superior tribunal in all cases of capture, did authorise them to receive appeals in cases circumstanced like this, was a point for them to decide; since it was a question arising in a case of capture, of all which cases (without any exception) they were constituted judges in the last resort. The merits of their decision we surely cannot now enquire into, but their authority to decide, not being limited, there was no method, by applying to any other court, of correcting any error they might commit, if in reality they should have committed any.
3. Whether their decision was right or wrong, yet nobody can deny that the jurisdiction of the commissioners was at least doubtful; of course the Court of Appeals found a case then depending in the former court of the commissioners, after a preliminary, but not a final, determination, for such I consider it to have been. It was therefore a cause then sub judice, and it being a case of capture and a question of appeal, no other court on earth, but that, in my opinion, could decide it. And no objection can be urged in this case against the authority of such a decision, or the propriety of its being final, but such as may be urged against all courts in the last resort, with respect to the merits of whose decisions there may be eternal disputes, but such disputes would be productive of eternal war, if some court had not authority to settle such questions for ever.
I, therefore, have not the smallest doubt, that the decision of *97 the court in 1783, was final and conclusive as to the parties to the decree. And this point appears to me so plain, that I think it useless to take notice of any authorities quoted on either fide, in relation to it, none of them, I conceive, in any manner contravening the conclusive quality of such decrees upon the principles I have stated, and some of them clearly, and beyond all question, supporting it.
The decree of September, 1783, being by me thus deemed final and conclusive, the next enquiry is,
Whether it was a decree which the District Court of New-Hampshire, or the Circuit Court of New-Hampshire acting specially in this cause for the legal reason alleged, had authority to enforce, either by decreeing a specific execution, or awarding damages for a non-performance of it?
Upon this branch of the subject a few words will be sufficient. The District Court, by the act of Congress, hath the whole original jurisdiction in admiralty and maritime causes. Whatever doubt might otherwise have arisen, the decision of this court upon the writ of error from Maryland, last February, fully established, that this includes a prize jurisdiction, as well as other cases of a maritime nature. I was not present when the decision was given; had I been so, I probably should have concurred in it, because the words, "all civil causes of admiralty and maritime jurisdiction," evidently include all maritime causes, whether peculiarly of admiralty jurisdiction or not; because a question of prize on the high seas is clearly of a maritime nature, and therefore the English distinction between an instance (which is strictly an admiralty) court, and a prize court, does not apply to this case; more especially as the District Court having as large authority given to it in all maritime causes of a civil nature, as the constitution itself prescribes. If that court does not possess such an authority, no court can be instituted with powers adequate to that purpose, so that under the present constitution, there could be no prize jurisdiction at all; and the very tenure of all the judges (which is for good behaviour) naturally excludes the idea of a temporary and occasional establishment of any courts whatsoever. I mention these reasons, not because the authority of the case receives any additional sanction from my opinion, but because I was desirous to take so favourable an opportunity of expressing my concurrence in a decision of so much importance.[*]
It was clearly shewn at the bar, that a Court of Admiralty in one nation, can carry into effect the determination of the Court of Admiralty of another. A Court of Prize being equally grounded on the law of nations as a Court of Admiralty, and proceeding also, as that does, on the principles of the civil law, *98 must, in common reason, have the same authority. I think it was rightly observed, that the sentence consisted, in effect, of two parts, one reversing the decree, and therefore vesting a right to a restitution or a recovery in value in the appellant, the other ordering a specific restitution. If that specific redress is from any cause rendered impracticable, those who have unjustly, and upon a sentence determined to be erroneous, received the property or its value to their own use, must in justice be accountable; otherwise form, which ought only to be the handmaid of right, might prove its treacherous destroyer. The District Court having sole original authority in cases of this kind, must have equal power, as to such subjects, with the power possessed by this court in any case where it has original jurisdiction, with this difference only, that in the one case a writ of error is allowed, in the other not. The Court of Appeals, which passed the final decree, having expired, there seems at least as much reason for a court of similar jurisdiction as to the subject-matter, proceeding to give effect to its decisions, as there can be for a Court of Admiralty of one nation giving effect to the decision of a Court of Admiralty of another, to which perhaps it is a perfect stranger, and of which it may know little more than that they equally belong to the great family of mankind. I am therefore of opinion, that the District Court, or the Circuit Court, acting specially in this instance on account of the incapacity of the former (as the law empowered it to do) had authority to enforce the decree in question, by decrecing damages in lieu of a specific restitution, which was impracticable.
The third question is,
Whether the authority hath been exercised properly in this instance, under all the circumstances of the case?
The material circumstances to be considered, either from facts admitted on the face of the record, or the public proceedings referred to by it, and of which we are judicially to take notice, seem to be as follow:
That the brig M'Clary was fitted out, under the authority, and pursuant to certain resolutions of Congress, in consequence of which, an act of the legislature had passed, in the state of New Hampshire, which complied partially with those resolutions, but made some regulations apparently intended as a restriction upon them (whatever might be their legal operation:) That on the 30th Oct. 1777, the captured the brig Susanna and cargo on the high seas: That the captured property was libelled in the Court Maritime of New Hampshire, (erected by the state law) on the 11th November, 1777: That Elisha Doane (whose administrators are the defendants in error in this cause) exhibited his claim on the 1st December following; and *99 on the 16th the property was condemned, and ordered to be distributed according to law: That within five days (the time for praying an appeal prescribed by the resolutions of Congress) Doane prayed an appeal to Congress, which was dissallowed: That he then prayed and obtained an appeal to the superior court of New Hampshire, agreeably to the directions of the state law, which allowed of such an appeal in cases of this kind, the act providing for an appeal to Congress, only in case of a capture by an armed vessel fitted out at the charge of the United Colonies: That on the first Tuesday in September, 1778, the superior court adjudged the property to be forfeited, and ordered it to be sold by the sheriff at public vendue for the use of the libellants; and the court further ordered, "that the proceeds "thereof, after deducting charges, should be paid to John Penhallow "and Jacob Treadwell, agents for the owners, and to "George Wentworth agent for the captors, to be by the said agents "paid and distributed to the persons mentioned therein, according "to the law of the state in that case made."
That an appeal from this decree to Congress was prayed within five days, and disallowed: and that afterwards, in obedience to the decree, and in virtue of it, the property was sold, and distributed to those entitled under the decree; and the proportionate shares (upon the supposition of a lawful capture) are admitted to have rightly been, one half to the owners, and the other half to the officers, mariners, and seamen.
That an application was afterwards made to the commissioners for hearing appeals under the authority of Congress; and after due notice to the libellants in the original suit, who appeared and pleaded to the jurisdiction, stating not only the defect of the authority of the court to sustain the appeal under any circumstances, but also special reasons why the Appellant was not entitled to the benefit of an appeal under the circumstances of the case (viz. the Appellant's waving the benefit of his appeal to Congress, by taking an actual appeal to the superior court of New-Hampshire; that the appeal first demanded, was not prosecuted for more than forty days; and that by the resolution of Congress, no appeal should be had from the verdict of a jury, but only the sentence of the judge) The commissioners, on the 26th June, 1779, decreed that they had jurisdiction, but declined any further proceedings at that time in the cause, for a reason they alledge.
That on the 12th September 1783, this case again came before the court of appeals, established under the articles of confederation; which, after a full hearing and solemn argument by the advocates on both sides, passed a definitive decree in these words, viz.
*100 "It is hereby considered, and finally adjudged and decreed by "this court, that the sentences or decrees passed by the inferior "and superior courts of judicature for the county of "Rockingham, in the above cause, so far as the same have relation "to the property specified in the claims of Elisha Doane, "Isaiah Doane, and James Shepherd, be, and the same are "hereby revoked, reversed, and annulled, and that the said property "specified in the said claims, be restored to the said claimants "respectively; and it is hereby ordered, that the parties to "the appeal each pay their own costs, which have accrued "in the prosecution of the said appeal in this court."
In this case considerable difficulty has arisen from the peculiar manner of pleading, which is said to be warranted by local practice, but which certainly has very much contributed to embarrass the question in the cause. There is neither a complete demurrer, nor, I conceive, a regular issue; and it may be deemed doubtful, whether what is termed a plea, ought to be considered as a plea or an answer. I had, therefore, at first strong doubts whether there was sufficient matter before us to ground a final decree: But upon reflection it seems to me, that as the case has been argued on both sides, upon a supposition that a final decree could be made; as there has been no application on either, for the examination of testimony, but the hearing took place without objection upon the pleadings as they stand, and consequently, we can regard the facts, only as stated on the record; as an express consent that the cause should be decided on this footing, would undoubtedly have been binding, and the circumstances in this case evidently prove an implied one; I think the pleadings as they stand, will afford sufficient foundation for a decree, especially according to those principles of practice, which we are told prevail in the state from which this record comes  a practice which, until altered, we undoubtedly ought to pursue, when it is not substantially inconsistent with justice.
Several objections have been offered (admitting the validity of the final decree, in respect to the authority of the court upon the points then before them) which I will consider in the best manner in my power. 
I. It is objected that the Appellant Doane was dead, before the final decision which was given in September, 1783; and this it is alledged, though not appearing on the face of the record, does appear from the letters of administration produced by the libellants, which letters are dated in February 1783.
Admitting that the courts are bound to inspect the date of the letters, and to regard that date as conclusive, and to infer the fact accordingly from it; several answers have been given to this objection; either of which, if valid, is decisive.
*101 1. That the proceeding in question was a proceeding in rem, and upon such proceeding in civil law courts, the death of a party does not abate. I incline to think the law is so, but as my opinion is clear on other points in answer to the objection, I avoid giving an opinion on this.
2. That admitting the decree for this cause to be erroneous, it can only be avoided by a solemn proceeding in the nature of a proceeding in error, and cannot be enquired into in this collateral way.
Upon this point I am clear, that the decree was not rendered absolutely void, but must stand regularly good till reversed for this error, if it be one. So the matter stood while the court of appeals was in being. If the Appellees could have avoided the decree for this error, they might have applied to that court to have reviewed its decree upon this suggestion. The expiration of the court is no reason why the law in this particular should be considered as changed. It is true, in many cases where there has been error in a suit, and this has affected the right of a person not a party, this error has been admitted to be shewn in a suit where the point came collaterally in question. But it has never been permitted to a party who might have set aside the original judgment for error. I speak now of proceedings at common law. The same reason, I think, applies in this case. It does, indeed, seem reasonable, that if one party can proceed in the District Court to enforce the decree, the other party may to impeach it. But then this ought to be done in the same mode as in the other court, and that for a very substantial reason: Because, when that suggestion is the sole ground of enquiry, the other party may come prepared to shew many things to do away its force. He may (for aught I know) be permitted to shew a mistake in the date of the letters. He may shew an actual knowledge of the fact by the other party previous to the decree, and an acquiescence in it. He may possibly shew that the administrators were in fact before the court, though this does not appear on the face of the proceedings. As the enquiry in this case is into a fact, perhaps any thing of this kind may be shewn, and, is so, there surely ought to be an opportunity of doing it.
3. There seems great reason in what was alleged at the bar, that though it might have been competent for the administrators, had the decree been against Doane, to have shewn this fact for error, because neither the principal nor they had any opportunity of supporting their right before the court, when the decree was given, the former being dead, and the latter not being called upon, yet that it is not competent for the Appellees, who were before the court, were heard, and cannot allege (had that been the fact) that they had sustained any prejudice by their being heard ex parte.
*102 It is a rule at common law (the reason applies in equity and other civil law cases) that is a party can plead a fact, material to his defence, and omits to do it at the proper time, he can never avail himself of it afterwards.
They had a day in court to plead the death of the Appellant. If they say they did not know of it, the same might be alleged in any case at common law, where we know it will not avail. The law rather chuses that a party should incur a risque of this nature, than leave a door open to endless litigation upon pretences, the truth of which it is very difficult to discover.
4. This is an error in fact, and, in my opinion, it was a powerful argument, that if we cannot reverse a decree even of a District or Circuit Court for any error in fact, we have no ground to set aside the solemn and final decree of a court that has expired, for such an error. The argument, in my opinion, is altogether a fortiori.
II. The death of Doane has been alleged for another purpose.
It is said, that the decree is to restore to Elisha Doane, which was impossible, because Elisha Doane was not then in being. Admitting that upon this record we are to take judicial notice that Doane was dead at the time of pronouncing the decree (in which I am by no means clear) yet if this was the real reason why the Plaintiffs in error had withheld the property or its proceeds, they might themselves have said so. They have not, and as each party generally makes the best of his own case, we are to presume that did not in fact constitute their reason. In this case it could be of no avail, but at the utmost to prevent the allowance of interest until a demand actually made. It never could destroy the whole beneficial effect of a decree given in rem, and when the parties who make the objection were in court, and parties to the very decree complained of. I think nothing can be more evident, than that if the decree be not totally void, the administrators are entitled to the benefit of it, at least until it is set aside for error, is there be any error in it, and such a remedy is now practicable. If a scire facias was necessary before execution could have been obtained out of the court which passed the decree, it could be for no other reason than that the other party might have an opportunity to contest the validity of the letters, and the existence of the administration, if any such objection could be supported. Such an objection might have been made here. It has not been made. There is, therefore, I conceive, no principle of law or justice which forbids giving effect to the decree upon this ground.
*103 III. Another objection is, that the cause was not regularly brought up to the Court of Appeals, and proceeded on, agreeably to the resolutions of Congress.
There does not appear any ground for this objection in point of fact. But I am clear that this is a point not now enquirable into. When a court has final and exclusive jurisdiction in a case, and has pronounced a solemn judgment, every other court must presume that all their previous proceedings were right, of which indeed they were the only competent judges.
IV. It is alledged, damages were not prayed for by the libel. It is a sufficient answer, that there is a prayer for general relief. And so little do I think of this objection, and so much of the duty of a court, unaided by formal applications, where there is a substantial one, that I am strongly induced to think, if a case proper for a specific relief was laid before a civil law court, and the direct contrary to the proper relief was prayed for, yet the court even in this case would be justified in granting the relief that might be properly afforded, if the party who had committed the mistake consented to it: without that indeed it might be improper, for no court ought to force a benefit on a party unwilling to receive it.
These objections being all got over, which were urged against any relief whatsoever, it is necessary to consider the particular objections against the relief actually afforded. And here, I think, very formidable objections occur.
I think the decree erroneous in these particulars:
1. In decreeing interest for the time previous to the date of the decree in 1783.
2. In granting full damages against all the parties, without distinguishing between the owners to whom one half was distributed, and the agent who received the other half for the benefit of the officers, mariners and seamen.
3. In making George Wentworth, the agent, personally liable for any part.
1. As to the first point, as this libel proceeds only, and can be supported, as I conceive, upon no other ground, upon the principle of enforcing the decree of September 1783, so that the Libellants might recover such benefit from it as the nature of the case could admit, their case is not to be made better or worse, as to the original right, than as the Court of Appeals decided it.
The Court of Appeals might have decreed satisfaction for detention, but did not. They did not even decree costs, but ordered each party to pay his own costs. These things were altogether discretionary in the court. That was the proper court to judge, whether any damages should be allowed for detention. If the decree is to be final and conclusive as to the *104 subject matter, it must be so as completely in respect to the detention, which formed one part of the case, as to the restoration, which formed the principal object of it.
I should indeed have had some doubts as to the subsequent interest, had it appeared that the Defendants had been unable to comply substantially with the decree, owing to the death of Doane, and the want, (had that been the case) of a subsequent demand by the Administrators. But as that is not alleged, and they set up their whole defence upon the point of right, merely, we are not to presume, that those circumstances (if the Administrators did not make a demand, with respect to which nothing appears) had any weight in inducing their non-compliance with the decree.
2. I am of opinion, that damages against all the Defendants jointly, ought not to have been given. We are to look at substance, not form. There were, in effect, two decrees originally, one half of the value of the property to one party, the other half to another. The reversal of the decree ought to affect the decree itself, in the manner in which it was given. Consequently, each party ought only to be required to restore what he was adjudged to receive. The case of joint trespasses stated at the bar, does, in my opinion, by no means apply. The privateer in question, had a lawful commission. In the execution of such an authority, difficulties often arise. Where they happen, bona fide, the master is considered in no fault, and neither he nor his owners made accountable, even in case of a mistaken seizure, but for restoration, and, at the utmost, costs. In case of gross misbehaviour, not only costs, but damages will be allowed by the court of prize. It seems now to be settled that they have exclusive jurisdiction on all such subjects. As not even costs were allowed in this case, we are to infer that the seizure was prima facie innocent; consequently, if a principle of the common law, deemed by many highly rigorous, and founded, perhaps, rather on the forms of proceeding, than on strict justice, is those forms did not interfere, could be applied to a case arising in a court, not only authorised, but bound to distinguish between a mere mistake, and a wanton abuse of power, there is no foundation for such an application, in fact, in the present instance.
As owners are, in all instances, made jointly liable ex contractu, and their respective shares are matters of private cognizance, so that they, in all instances, appear jointly before the court, and a payment to one owner is, in law, a payment to all; I can discover no principle, upon which any discrimination could be properly made in this case, in regard to the different interests and actual receipts of the owners. I think, therefore, the decree in regard to one moiety, ought to be jointly against all the owners.
*105 3 The third error in the decree, in my opinion, is, making George Wentworth, the agent, liable for any part. I have had considerable doubts on this subject, but upon the fullest consideration I have been able to bestow on it, I think he is not liable. Had he held any of the property, at the time of the decree of the Court of Appeals, he would have been undoubtedly liable. Had he any now, or any of the proceeds in his hands, he would also be liable. Perhaps he might, had he held any of the property or proceeds, after actual notice of the Court of Appeals taking cognizance of this case. Neither of these facts appears on the face of the record, and as they are of importance, and neither is asserted, neither is to be presumed. The contrary, indeed, may be fairly inferred from the statement on the record, and has been candidly acknowledged to be the real truth. He therefore appears in the character of a mere agent, acting avowedly for the benefit of others, and not for his own; and as he had paid away the money in virtue of a decree of a court, having prima facie authority for the time, to decide whether an appeal did, or did not lie; I think he ought not to be ordered to refund. It is alleged that the prayer of an appeal, in a case where an appeal lies, ipso facto, suspends the proceedings, and all afterwards is coram non judice. I cannot admit the doctrine in that extent. Where there are inferior and superior jurisdictions, and an appeal is allowed from the former to the latter, and it is the express duty of the party praying an appeal, to apply in the first instance, to the inferior court (as I conceive it was in this case under the resolutions of Congress, which directed an appeal to be prayed for within five days, and security to be taken) I must presume that that court is prima facie to judge whether it is applied for in a proper manner, and whether all the requisites previous to his being fully entitled to it, are complied with. If the court decides in any of these particulars erroneously, it would be absurd to say, that the party should lose the benefit of his appeal, but, in my opinion, it would be equally unjust to hold, that a party who obeyed the decree of a court, over whom he had no controul, should suffer by his respect to the law, which constituted that court, and which must therefore mean to support its decisions, in a cause coming within its jurisdiction, while they remain uncontrouled by any superior tribunal. It was shewn, that an inhibition, in cases of this kind, sometimes at least issues to forbid the court's further proceeding. Can there be a stronger proof, that the court had authority de facto (whatever may be said as to its authority de jure) without that interposition! The law never does a nugatory act, and therefore, I presume, would not forbid the doing of a thing, which if done, is totally and absolutely void. It was said, this was to bring the judge into contempt. *106 But if the conduct of the judge who is bound to know his jurisdiction is in the mean time innocent, surely an obedience to him by a party, who is not to be presumed capable of deciding on the jurisdiction by his own judgment, must be so. George Wentworth, on the face of the whole proceedings, was a more agent, an attorney in fact, and for aught I can fee, as little liable to refund in a case of this sort, as any attorney, in fact, or even an attorney at law, to whom money had been paid under a judgment or decree, and who had paid it away to his client. An agent in cases of this kind, is allowed by law. They are recognized, I believe, in all prize acts. Mariners, whose employment is on the sea, cannot be required without injustice to attend their cases in person. In cases of privateers, the captors are so numerous that the employment of one or more agents on shore, seems unavoidable. The law, when it allows a benefit, never intends that it shall be imperfectly enjoyed; therefore in allowing privateering, it allows agents. These I consider as nominal parties, and that the real parties are their principals. Now I will suppose that in a common law case an infant sues in a personal action by his guardian, and obtains a judgment; the guardian receives the money, and pays it to the infant after he comes of age. The judgment is afterwards reversed. Can the guardian ever be made to refund to the defendant, or must the person who was the infant do it? This case appears to me a very parallel one in all its circumstances. The infant cannot act for himself, and therefore is allowed to act by his guardian. The law takes notice, by allowing agents, that persons concerned in privateers, at least, cannot do well without them. The guardian is nominally a party; so is the agent: but the infant, in the one case, and the principals, in the other, are the real parties. The guardian is accountable to the infant, for money he received for him: so is the agent to the principal, for money he receives. There is, that I can imagine, but one difference, that can be suggested between them; that in the one case, the judgment is good till reversed; and, therefore, all lawful acts intermediately done, are valid. But the disallowance of the appeal, is said to be a nullity, and all subsequent proceedings in that court are void. I admit the consequence, if the law be so. But I have already stated reasons, why I think it is otherwise. A court of justice, indeed, ought at its peril to take notice of its own jurisdiction, and it is not often that cases of such doubt arise, that a Judge can be at a loss on the subject. But it may happen, and does sometimes happen, that innocent and serious doubts, are really entertained. Is a court, therefore, because its judgments may be finally diffented from, by a superior tribunal, to be considered as flying in the face of the law, so that parties before it, shall not *107 only be protected in disobeying it, but punished for their obedience? If this be the case, the old maxim, cedunt arma tog, will very ill apply to Courts of Justice. Instead of being the peaceful arbiters of right, and the sacred asylum of unprotected innocence, their very forums will be the seat of war and confusion. I admit, indeed, where there is a conflict of jurisdiction, and the party entitled to a decree, is prohibited from obeying it, by a power claiming a superior cognizance, he must at his peril obey one or the other; but this arises from the absolute necessity of the case, because, whether the one or the other be right or wrong, must depend on a subsequent decision. In this case, George Wentworth, before the distribution, received no monition, or any other process from the tribunal alledged to be superior. He could not even be certain that the Appellants would carry their application further. I consider him, therefore, justifiable in obeying the decree, which at the time, was compulsory upon him, and for a disobedience to which, he might have been committed for a contempt, according to the opinion of the court which pronounced it. The parties still have their remedy against those who actually received the money, or their representatives, if they can be found. They may perhaps be entitled to a remedy under the bond gived, when the commission of the privateer was granted. If either of these remedies be difficult or inefficient, that does not make George Wentworth, in point of law, more liable than if they were perfectly easy, and clearly effectual. It will be one melancholy instance, in addition to a thousand others, of the distress incident to a doubtful and imperfect system of jurisprudence, which has been since happily changed for one so precise and so comprehensive, as to leave little room for such painful and destructive questions hereafter.
The 4th question is,
Whether this court can now rectify the decree in respect to the parts of it considered to be erroneous, or must affirm or reverse in the whole.
The latter is certainly the general method at common law, and it has been contended, that as this proceeding is on a writ of error, it must have all the incidents of a writ of error at common law. The argument would be conclusive, if this was a common law proceeding, but as it is not, I do not conceive, that it necessarily applies. An incident to one subject cannot be presumed, by the very name of such an incident, to be intended to apply to a subject totally different. I presume the term, "writ of error," was made use of, because we are prohibited from reviewing facts, and therefore must be confined to the errors on the record. But as this is a civil law proceeding, I conceive the word "error" must be applied to such errors *108 as are deemed such, by the principles of the civil law, and that in rectifying the error, we must proceed according to those principles. In a civil law court, I believe, it is the constant practice to modify a decree upon an appeal, as the justice of the case requires; and in this instance, it appears to me, under the 24th section of the judicial act, we are to render such a decree as, in our opinion, the District Court ought to have rendered. If this was a case, wherein damages were uncertain, and wherein for that reason, the cause should be remanded for a final decision, (which it does not appear to be, because the Libellants in the original suit had a decree in their favour, which is now to be affirmed in part) yet the damages here are not uncertain, because we all agree, that interest ought to be allowed from the date of the decree, in September, 1783, upon the value of the property, as specified in the report, against those who are to be adjudged to pay the principal.
Upon the whole, my opinion is, that the decree be affirmed in respect to the recovery of the Libellants, in the original action against all the Defendants but George Wentworth; that the libel against him, be adjudged to be dismissed; but that there be recovered against the other Defendants in the original action, the value of the property they received, as ascertained in the Circuit Court, with interest from the 17th of September, 1783.
I am also of opinion, that the respective parties should pay their own costs.
BLAIR, Justice.
When this cause came before me, at Exeter, in New Hampshire, I felt myself in a delicate situation, in having a cause of such magnitude, and at the same time, of such novelty and difficulty, as to have drawn the judgment of men of eminence, different ways, brought before me for my single decision. It was, however, a consolation to know, that whatever that decision might be, it was not intended to be final, and I can truly say, it will give me pleasure to have any errors I may have committed, corrected in this court. Two points, and if I mistake not, only two, were brought before me: The first, whether under the description of Admiralty and Maritime jurisdiction, the judiciary bill gave to the District Court any jurisdiction concerning prizes, I decided in the affirmative; and the same decision having been afterwards made in this court, in the case of Glasse, and others, I consider that as now settled. The other point, was, whether the Court of Appeals, erected by Congress, had authority to reverse the sentences given in the Courts of Admiralty of the several States; and the source of the objection upon this point, was the defect of authority in the Congress itself. Here, also, my sentence affirmed the jurisdiction.
I have attended as diligently, and as impartially as I could, *109 to the arguments of the gentlemen, upon the present occasion, to discover, if possible, how I may have been led astray, in the decision of this question; but as the impressions which my mind first received, continue uneffaced, (whether through the force of truth, or from the difficulty of changing opinions, once deliberately formed) I will repeat here the opinion which I delivered in the Circuit Court, as the best method I can take for explaining the reasons upon which it was founded. I would premise, however, that it contains something relative to what had been said at the bar of the Circuit Court, but which I believe was not mentioned on this occasion.
"The immediate question is, whether Congress had a right to exercise, by themselves, by their committees, or by any regular court of Appeals by them erected, an appellate jurisdiction, to affirm or reverse a sentence of a state court of Admiralty, in a question whether prize or no prize. If they possessed such an authority, it must be derivative, and its source either mediately or immediately the will of the people; usurpation can give no right. The respondents contend they had no such authority, till the completion of the Consideration in 1781, but only a recommendatory power; the Libellants insist, that Congress was considered as the sovereign power of war and peace, respecting Great-Britain, and that to that power is necessarily incident that of carrying on war in a regular way, of raising armies, making regulations for their discipline and government, commissioning officers, equipping slects, granting letters of marque and reprisal, the power (now contested) of deciding, in all cases of capture, questions whether prize or not, and every power necessarily incident to a state of war. It is, at least, certain, that the political situation of the American Colonies, required a union of council and of force, by wise measures to bring about, if possible, a reconciliation with the mother-country, on a basis of freedom and security, or, if this should fail, by vigorous measures to defeat the designs of their tyrannical invaders; and although this alone cannot suffice for an investiture in Congress, of the powers necessary to that end, yet if the powers given be delegated in terms large enough to comprehend this extent of authority, but which may also be satisfied by a more limited construction, the supposed necessity for such powers given to a federal head (and the counsel for the respondents have admitted that it would have been good policy) is no contemptible argument for supposing it actually given. In the beginning of the year 1775, our affairs were drawing fast to a crisis, and for some time before the battle of Lexington, a state of warfare must in the minds of all men have been an expected event. Some of the delagations (I think three) of members to the Congress which met in May of that year, *110 contain nothing but simple powers to meet Congress; the rest expressly give authority to their delagates to consent to all such further measures, as they and the said Congress shall think necessary, for obtaining a redress of American grievances, and a security of their rights. It is not in all of them worded alike, but in substance, that seems to be the sense. Every thing which may be deemed necessary! I think it cannot well be supposed, that in such a delegation of authority, at such a time, there was not an eye to war, if that should become necessary. But it is objected, that at most, no greater power was given to Congress than to enter into a definitive war with Great-Britain, not the right of war and peace generally; and even that war, till the declaration of independence, would be only a civil war. But why is not a definitive war against Great-Britain (call it if you will a civil war) to be conducted on the same principles as any other: If it was a civil war, still we do not allow it to have been a rebellion  America resisted and became thereby engaged in what the deemed a just war. It was not the war of a lawless banditti, but of freemen fighting for their dearest rights, and of men lovers of order and good government. Was it not as necessary in such a war, as in any between contending nations, that the law of nations should be observed, and that those who had the conducting of it, should be armed with every authority for preventing injuries to neutral powers, and their subjects, and even cruelty to the enemy? The power supposed to have been given to Congress, being confined to a definitive war against Great-Britain, and not extending to the rights of peace and war generally, appears to me to make no material difference; still the same necessity recurs, of confining the evil of the war to the enemy against whom it is waged. Till a formal declaration of independence the people of the Colonies are said to have continued subjects to Great-Britain; true, and that circumstance it is, which denominates the war a civil war, as to which I have already stated how, in my mind, the question is affected by that circumstance. But it was asked whether, if during the war, Great-Britain, at any time before the declaration of independence, had declared war against any nation of Europe, that nation would not have had a right to treat America with hostility as being subject to Great-Britain? According to this supposition, Great-Britain might have had some temptation to declare such war that she might have the co-operation of her enemy, to reduce her colonies to obedience. But Great-Britain was too wife to adopt such a policy; she knew that by her engaging in such a war, the colonies, instead of finding a new enemy to oppose, would have known where to find a friend; they might have formed an alliance with such a power, who probably would have considered it as an acquisition, *111 and Congress might have been the sooner encouraged to separate from Great-Britain, by a formal declaration of independence. As the supposition that Congress was invested with all the rights of war, in respect to Great-Britain, is of great moment in the present cause, and as the power may not be so satisfactorily conveyed by the instructions to the several delegates as might be wished, partly because some of them did not exhibit farther instructions than to attend Congress, and partly because the instructions given to the rest, may be satisfied by a different construction, it may be proper to consider the manner in which Congress, by their proceedings, appear to have considered their powers; not that by any thing of this fort, they had a right to extend their authority to the desired point, if it was not given, but because in shewing by such means, their sense of the extent of their power, they gave an opportunity to their constituents to express their disapprobation, if they conceived Congress to have usurped power, or by their co-operation to confirm the construction of Congress; which would be as legitimate a source of authority, as if it had been given at first. If they were only a mere council, to unite by their advice and recommendation all the States in the same common measures (which, by the by, if not uniformly pursued, might be disappointed) then the several members might be justly compared to ambassadors met in a Congress, and could only report their proceedings for the ratification of their principals; but Congress resolved to put the colonies in a state of defence; they raised an army, they appointed a commander in chief, with other general and field officers; they modelled the army, disposed of the troops, emitted bills of credit, pledged the confederated colonies for the redemption of them, and in short, acted in all respects like a body completely armed with all the powers of war; and at all this I find not the least symptom of discontent among all the confederated states, or the whole people of America; on the contrary, Congress were universally revered, and looked up to as our political fathers, and the faviours of their country. But if Congress possessed the right of war, they had also authority to equip a naval force; they did so, and exercised the fame authority over it, as they had done over the army; they passed a resolution for permitting the inhabitants of the colonies to fit out armed vessels to cruize against the enemies of America; directed what vessels should be subject to capture, and prescribed a rule of distribution of prizes, together with a form of commission, and instructions to the commanders of private ships of war: they directed that the general assemblies, conventions, and councils or committees of safety of the United Colonies, should be supplied with blank commissions, signed by the President of Congress, *112 to be by them filled up, and delivered to any person intending to fit out private ships of war, on his executing a bond, forms of which were to be sent with the commissions, and the bonds to be returned to Congress. These bonds are given to the President of Congress, in trust for the use of the United Colonies, with condition to conform to the commission and instructions. The commission, under which the Captain of the respondents acted, was one of these commissions, it seems, only this is attempted to be qualified by saying that it was countersigned by the Governor of New Hampshire; but this circumstance seems to me to be of no importance. Whoever has the right of commissioning and instructing, must certainly have the right of examining and controuling, of confirming or annulling the acts of him who accepts the commission, and acts under it. And this exercise of authority in granting commissions seems to have had the special sanction of the several colonies, as they filled up the commissions, took the bonds, and transmitted them to Congress. It was urged in the course of the argument, that if Congress did enjoy the power contended for, the confederation, which was a thing of such long and anxious expectation, was not of any consequence; but it is to be observed, that that instrument contained some important powers which could not be derived from the right of war and peace; it was of importance also, as a confirmation of the powers claimed as necessarily incident to war, because some of the states appeared not to be sensible of, nor to have acknowledged such incidency; and yet the power may have existed before. It is true, that instrument is worded in a manner, on which some stress has been laid, that the several States should retain their sovereignties, and all powers not thereby expressly delegated to Congress, as if they were, till the ratification of that compact, in possession of all the powers thereby delegated; but it seems to me, that it would be going too far, from a single expression, used perhaps in a loose sense, to draw an inference so contrary to a known fact, to wit, that Congress was, with the approbation of the states, in possession of some of the powers there mentioned, which yet, if the word `retain' be taken in so strict a sense, it must be supposed they never had. I take the truth to be, that the framers of that instrument were contemplating what powers Congress ought to have had at the beginning; and that in reference to the first occasion of their assembling to oppose the tyranny of Great Brittain, at least in reference to the time of framing the confederation, say, the states shall retain. But however that may be, as I said before, I think it is laying too great a stress upon a single word, to contradict some things which were evidently true.
"But it was said that New Hampshire had a right to revoke *113 any authority she may have consented to give to Congress, and that by her acts of assembly she did in fact revoke it, if it were ever given. To this a very satisfactory answer was made: if she had such a right, there was but one way of exercising it, that is, by withdrawing herself from the confederacy; while she continued a member, and had representative in Congress, she was certainly bound by the acts of Congress. I am therefore of opinion that those acts of New Hampshire, which restrain the jurisdiction of Congress, being contrary to the legitimate powers of Congress, can have no binding force, and that under the authority of Congress an appeal well lay from the Courts of Admiralty of that State, to the Court of Commissioners of Appeals. That Court has already affirmed their jurisdiction in this particular case, upon a plea put in against it; and upon that account, also, I incline to think that this court, not being a court of superior authority, ought not to call it in question. Under these impressions, I must, of course, decree (whatever may be the hardship of the case) that the Respondents, pay to the Libellants, their damages and costs, occasioned by not complying with the decree of the Court of Appeals, the quantum of which to be ascertained by Commissioners."
If the reasoning upon which I went, in pronouncing the above decree, in favour of the jurisdiction of the Court of Appeals, be unsound, and if the decree stand in need of some better support, it will probably find it in the consederation, by which authority is given to Congress, to erect Courts of Appeal in all cases; and from that time the authority of the court of Appeals is confessed; the present case was then depending before that court, they asserted their jurisdiction, and gave a final decree. As to the objection, that previously to the consederation, Congress were themselves sensible, that they did not possess supreme Admiralty jurisdiction, because of their recommending to the several States, that they should erect Courts of Admiralty, for the trial of prizes, with appeal to Congress, I fee not how such recommendations can prove any thing of the kind; for Congress might have authority to establish such courts in the respective States, when yet they chose only to recommend to the states to do it. But admitting the authority of the Court of Appeals, and the propriety of applying to the District Court of New Hampshire, to inforce that decree in the way of damages, for not restoring the vessel and cargo, when through the disobedience of the present Plaintiffs in error, specific restitution was become impossible, yet if any thing erroneous can be found in the decree of the Circuit Court, it is the duty of this court to correct it. It is objected, that the damages allowed, were too high, including interest on the appreciation *114 of the Susanna and her cargo, from so remote a period as the sale of the vessel and cargo.
That George Wentworth, being a mere agent, and having distributed among those who were entitled, under the decrees of the Courts of Admiralty of New Hampshire, all the money by him received for their use, ought not to have been subjected by the decree of the Circuit Court, to the repayment of that money.
And that a lumping decree, subjecting the Respondents indiscriminately, to the payment of all the damages, although their interests were several and distinct, was also erroneous.
It does not, indeed, appear to me, that the decree is for the payment of too large a sum, the damages having been swelled by interest, calculated upon the appraised value of the Susanna, her apparel, and of her cargo, from so remote a period. The decree of the Court of Appeals was merely for restitution, and that the Appellants should be placed at that time in the same situation as they were in, previous to the capture. A compensation for the loss they sustained in being in the mean time deprived of their property, was not provided for in the decree, nor were even costs allowed. The libel in the Circuit Court being bottomed on the decree of reversal, sought only a compensation in damages equivalent to a restitution at the time of the reversal: Interest, therefore, ought, I think, to have been allowed only from that time.
George Wentworth, it is true, was not concerned in interest; he represented the interest of the officers and seamen, but had none himself; and a mere agent who has paid away all, or any part of the money by him received in that character, without having been by a monition notified of the appeal, will be allowed credit in his account for the money so paid away. But George Wentworth appears, I think, in another character besides that of an agent: he was a party libellant, as such he knew that the Claimants were dissatisfied with the decrees of the Admiralty Courts of New Hampshire, having prayed an appeal to Congress, and offered the requisite security; and when the petition of appeal was referred to the Court of Commissioners, and they directed notice to be given to the parties, who appeared before that court, it seems evident that they had notice. What then is the effect of this? Was any thing further necessary to suspend the decrees of the State Courts? An inhibition is, indeed, worded in a manner naturally leading to the supposition, that that instrument was necessary to effect a suspension; but this, I think, cannot be the case; for, it is observable, that by the practice, an interval of three months is allowed before the inhibition is sued out, in which time, if nothing had antecedently suspended the sentence, it might be carried *115 into complete effect, and every body be justified in their conduct, as paying obedience to a decree continuing in full force. The inhibition may be intended only as a more formal direction to cease farther proceedings, when yet they may have been inhibited before: it has a farther use also, for it appoints a day for the attendance of the parties. Conformably to this idea, it is said, in Domat, that the appeal suspends the decree. But a distinction is attempted here; it is admitted that an appeal allowed by the inferior court, suspends, while an appeal received by a superior court, is denied to have that effect. But according to Domat, it works a suspension, even against the will of the inferior Judge; and it would be very strange, if the suspending operation of an appeal, to a Judge who has an authority to reverse, should depend upon the consent of the inferior Judge. But if the sentences of the State Courts were indeed suspended, no person had authority to act under them; and if any do, he takes upon himself the consequences. Besides, if George Wentworth had innocently and without notice, distributed the money which came to his hands, should not this have been shewn to the Court of Appeals? If that had been done, perhaps after reversing the decrees of the State Court, instead of decreeing restitution, they might have only decreed that the owners should pay to the Appellants, the moiety of the sales by them received. But they have decreed restitution specifically; and if this court should so model the decree of the Circuit Court, as to exonerate Mr. Wentworth, as to the moiety of the money by him received, it will substantially alter the decree of the Court of Appeals; and yet we say, that the decree now is to be bottomed on that of the Court of Appeals, which is now to be supposed right; and that for that reason it was erroneous in the Circuit Court, to carry interest farther back than from the period of reversal, and in this way give damages, which were not intended by the Court of Appeals.
The decree of the Circuit Court, appears now, I confess, to be wrong, in that it subjects all the Defendants, indiscriminately, to the payment of all the damages. In the original libel, they had indeed joined, but it was in right of several interests, which I think ought to have been distinguished in the decree; justice obviously requires this; so obviously, that it is enough to state the case to obtain the mind's assent to the propriety of distributive damages, instead of those which the decree contemplates. I will only say further, that I have no remembrance of having had this point brought to my view at the Circuit Court, and it certainly did not occur to myself; but if any thing was said upon the point, and I, with deliberation; then preferred the decree as it stands, I am clearly now, of a different opinion. Upon the whole, I think the decree of the *116 Circuit Court will stand as it ought, when corrected by reducing the damages in the manner proposed, and when so reduced, by proportioning them among the then Defendants, according to their distinct interests.
CUSHING, Justice.
The facts of this case being already fully stated by the court, I shall go on to enquire, whether the decree of the Circuit Court ought to be reversed, for any of the errors assigned.
The first is, that the Court of Appeals, which made the decree of restoration, had not jurisdiction of the cause.
In answer to this, I concur with the rest of the court, that the Court of Appeals, being a court under the confederation of 1781, of all the states, and being a court for "determining finally, appeals in all cases of capture," and so being the highest court, the dernier resort in all such cases, their decision upon the jurisdiction and upon the merits of the cause, having heard the parties by their council, must be final and conclusive, to this, and all other courts: to this, as a Court of Admiralty, because it is a court of the same kind, as far as relates to prize, and without any controuling or revisionary powers over it; to this as a court of common law, because it is entirely a prize-matter, and not of common law cognizance. The cases, therefore, cited to shew, that the common law is of general jurisdiction, and that the court of King's bench, prohibits, controuls, and keeps within their line, Admiralty Courts, Spiritual Courts, and other courts of a special, limited jurisdiction, do not, I conceive, touch this case.
It is conceded by all, that the decision of a court competent is final and binding. Now, if the Court of Appeals was, under the consederation of all the states, a court constituted "for determining finally appeals in all cases of capture," it was a court competent; and they have decided. Again, the Admiralty of England gives credence and force to the decisions of foreign courts of Admiralty; why not equal reason here?
It is true, the courts of common law there, will not allow a greater latitude to the jurisdiction of foreign courts of Admiralty, than to their own; as it seems natural and reasonable, they should not; for instance, holding plea of a contract made entirely at land, which seems to have been the substantial ground of a prohibition, in the case cited, respecting the decree in Spain.
If the decree of the court of Appeals must he considered as binding, as it must, or there may never be an end to this controversy; that will carry an answer to several other errors assigned, viz. the third, fifth, and seventh, respecting the cause not being regularly before Congress or the court, and respecting the Circuit Court not entering into the merits  and to *117 some other particular exceptions; as, that appealing to the Superior Court of New-Hampshire, was a waver of the right of appeal to Congress: If that appeal was consistent with the resolve of Congress, which only provided an appeal to Congress in the last resort, it was not a waver. Again, it is said, there ought to have been a jury at the Court of Appeals; but that, clearly, was not the intent of the resolve of Congress, nor of the Consederation, nor correspondent to the proceedings in courts of Admiralty, even where trials by jury are used and accustomed in other matters; nor was it thought a proper or necessary provision in the present constitution, which has been adopted by the people of the United States.
As to the original question of the powers of Congress, respecting captures, much has been well and eloquently said on both sides. I have no doubt of the sovereignty of the states, saving the power delegated to Congress, being such as were, "proper and necessary" to carry on, unitedly, the common defence in the open war, that was waged against this country, and in support of their liberties to the end of the contest.
But, as has been said, I conceive we are concluded upon that point, by a final decision heretofore made.
The 2d exception in error is, that the sentence of the Court of Appeals was void by the death of Mr. Doane.
That fact does not appear upon the record of the Court of Appeals, and I think we cannot reverse the decree in this incidental way, if it could be done upon a writ of error. If it was pleadable in abatement, it ought to have been pleaded or suggested there by the opposite party.
On the contrary, it is implied by the record, that Doane was alive; otherwise he could not have been heard by his council as the record sets forth; for a dead man could not have council or attorney. On the other hand, the letters of administration imply that he was dead at the time; but those letters were not before the court, and therefore could not be a ground for their abating the suit, if it was abateable at all for such a cause. Here seems to be record against record, as far as implications go, and I take it to be an error in fact, for which, by the judicial act, there is to be no reversal. Upon this head, a case in Sir Thos. Raymond, is cited by the council for the Plaintiff in error, of trover by five plaintiffs  one dies  the rest proceed to verdict and judgment  and adjudged error, because every man is to recover according to the right he has at the time of bringing the action; and here each one was not, at the time of bringing the action, entitled to so much as at the death of one of the plaintiffs.
But a case in Chancery Cases, p. 122, is more in point  where money was made payable by the decree to a man that *118 was dead, and yet adjudged, among other things, no error. But another matter, which seems well to rule this case, is, that, being a suit in rem, death does not abate it.
So say some books, and I do not remember to have heard any to the contrary. It does not affect the justice of the cause; it makes no odds to the plaintiff in error, whether the money is to be paid to Colonel Doane being alive, or to his legal representatives, if dead.
The 4th exception, that damages are not prayed for, yet decreed, is answered by a prayer for general relief.
The 8th exception is, that the District and Circuit Court possessed not admiralty jurisdiction, and that the Circuit Court had no right to carry the decree into execution.
If courts of Admiralty can carry into execution decrees of foreign Admiralties, as seems to be settled law and usage; and if the District and Circuit Courts, have admiralty powers by the law and constitution, as was adjudged and determined by this court last February, I think there can be no doubt upon this point
Another question of consequence is, whether Mr. George Wentworth, being agent for the captors, and having paid over, can be answerable jointly with the other libellants for the whole, or, in any way, for any part. If it was simply the case of an agent regularly paying over, I should suppose he could not justly be called upon to refund. But it seems he was an original libellant, a party through the whole course of the suit; and an appeal being claimed in time, at the court and term, at which the libellants obtained the decree (of which, therefore, he had legal notice) the appeal, if a lawful one, in my opinion, suspended the sentence and must make him answerable for whatever monies he should receive under that decree, in case of reversal: every man being bound to take notice of the law, at his peril.
It is suggested, that an inhibition was necessary to take off the force of the sentence. An inhibition (according to the form of one produced, which issued in England last July, near four months after the trial and appeal at New-Providence inhibits the judge and the party from doing any thing in prejudice of the appeal, or of the jurisdiction of the court appealed to, and cites the party to appear and answer the party appellant, at a certain time and place. The citation to the party to appear and answer at the proper time and place, I take to be the most substantial part of the process; the inhibitory part to be rather matter of form, or in pursuance of the suspending nature of the appeal, and as a further guard and caution against mis-applying the property. For it appears to me absurd to suppose, that an inhibition taken out seven or eight months after the *119 appeal (nine months being allowed for the pnrpose) should be the only thing that suspended the sentence, leaving the judge below and the party, all that time, to carry the sentence into compleat execution.
The judicial act in providing an appeal in maritime causes to the Circuit Court, contains no hint of an inhibition as necessary to suspend the sentence. Domat is express, that an appeal has that effect, and I believe other civil law writers.
The rejection of the appeal, if unwarranted, could not take away the right of the citizen.
There does not appear any thing actually compulsory upon Mr. George Wentworth, to pay the money, except what may be supposed to be contained in the decree appealed from, the force of which was suspended. All this matter might have been offered at the Court of appeals, where the parties were fully heard, and, if offered, was, no doubt, involved in their decision.
It is said, if I understood the matter right, that there ought to have been a monition from the Circuit Court to Mr. Wentworth, to bring in what he had in his hands.
I see no necessity for a monition exactly in that form. There was a monition to come in and answer the libellants upon the justice of the cause, as set forth;  he came in and had an opportunity to defend himself: and the question was, whether he was answerable upon the circumstances of the case, which was determined by the court.
By the cases in Durnford and East, as well as from other books, it is clear that the admiralty has not only jurisdiction in rem, but also power over the persons of the captors and all those who have come to the possession of the proceeds of the prize, to do complete justice as the case requires, to captors and claimants.
But I cannot conceive why the decree of the court of appeals is not conclusive upon Mr. George Wentworth as much as upon the other libellants.
Again; it is objected, that the decree being for restoration, damages could not be awarded. The decree was not complied with  the thing was gone. How, then, could justice be done without giving damages?
Then the question is, how are we to understand the decree; as joint upon all the libellants for thewhole, Mr. George Wentworth included, or as decreeing the owners to restore one half, and Mr. George Wentworth, agent for the captors, the other half?
If the latter, which perhaps may be a reasonable and just construction, conformable to the spirit of the original libel, then the decree of the Circuit Court is in that respect erroneous. *120 Also as to damages, I suppose, interest ought not to have been allowed farther back than the decree. The only question that remains, is whether this court can rectify those errors, consistently with the judicial act. And I think it may, as there is sufficient matter, apparent upon the record, to do it by.
I agree that each party bear their own costs of this court.
BY THE COURT. Ordered, That against all the Plaintiffs in error, except George Wentworth, sixteen thousand three hundred and sixty dollars and sixty-eight cents, be recovered by the Defendants in error, and the same sum against George Wentworth; and that against the Plaintiffs in error the costs of the Circuit Court be recovered, one half against George Wentworth, and the other half against the other Plaintiffs in error; and that in this Court the parties pay their own costs.
NOTES
[*] 2 Dom. 686.
[*] See Glass et al. versus The Betsey et al. ant.