Joseph DiSALVATORE and Mary DiSalvatore, Administrator and Administratrix of the Estate of Michael DiSalvatore, Deceased.

v.

The UNITED STATES of America.

Civ. A. No. 76–1794.

United States District Court,
E. D. Pennsylvania.

June 26, 1979.

James E. Beasley, Arlene Freiman, Philadelphia, Pa., for plaintiffs.

Charles B. Burr, II, D. Timothy Tammany, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

This action brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, alleges that plaintiffs' decedent was killed as a result of defendant's negligence. Defendant's motion for summary judgment was denied on September 15, 1978, *DiSalvatore v. United States of America,* 456 F.Supp. 1079 (E.D.Pa. 1978), and the issue of liability was tried before me on December 18 and 19, 1978. I now make the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

1.  Michael DiSalvatore was employed by American Bridge Company to work on construction of the Social Security Administra-

tion Program Center at 3rd and Spring Garden Streets, Philadelphia, Pennsylvania. (P. 23, part II, § Ia and § IIb).[1]

2. Michael DiSalvatore was killed at 12:05 P.M. on April 12, 1974 when he fell from the sixth floor of the building to the floor of the pit of freight elevator No. 1. (P. 23, Part II, § 4A).

3. Entities Involved—

A. The General Services Administration of the United States (GSA) is the owner of the construction site at 3rd and Spring Garden Streets, Philadelphia. The terms "contracting officer", "resident engineer" and "project manager", when used in the applicable contracts refer to United States Government employees. (P. 40, P. 41; N.T. 19 & 20). Albert Kandra, as Resident Engineer, was the Government's representative on the job site at the Social Security Building. (N.T. 9, N.T. 12, N.T. 21).

B. Turner Construction Company (Turner) was hired by GSA as overall construction manager for the Social Security Administration Center project in Philadelphia. (P. 40).

C. Owens-Corning Fiberglass Corporation and Wolf & Munier, Inc. (Owens-Corning), a joint venture, was hired by GSA as the prime contractor for the Social Security Administration Center project. (P. 41).

D. Tishman Construction Company (Tishman) was hired by the Owens-Corning-Wolf-Munier joint venture as construction manager. (P. 41).

E. American Bridge Company was hired by Tishman Construction Company to design, fabricate and erect the structural steel at the site. (D–1).

## THE ACCIDENT

4. Michael DiSalvatore's specific job at the time of the accident was to uncover the floor opening for freight elevator No. 1 on the sixth floor of the Social Security Building. (P. 23, part II, § 11D).

5. The planking was being removed to allow the concrete workers to frame out the elevator shaft. (N.T. 47–48; N.T. 77; N.T. 81; N.T. 90–91; N.T. 98–99). The planking had already been removed from the floors below the sixth. (N.T. 214).

6. Although not an imperative procedure, removal of the planking from an elevator shaft for the purpose of framing the opening is an acceptable method of construction. When this removal method is used safety requires either that the floor below be planked or that a net be hung in the open shaft. (N.T. 120–121).

7. At the time of DiSalvatore's accident, the elevator opening on the sixth floor was protected neither by planking on the floor below nor by a net hung in the shaft. (N.T. 214; N.T. 220; N.T. 270).

8. The failure to have either a net hung from the sixth floor elevator opening or planking on the fifth floor shaft violated the safety provisions of the government construction contracts. (N.T. 43; N.T. 88–89; N.T. 121; N.T. 127; P. 23, part II, § III D1).

9. At the time of his accident, DiSalvatore was working with Harry Rolf, a journeyman ironworker and DiSalvatore's "buddy" on the job. (N.T. 209). DiSalvatore and Rolf removed the planks over the elevator opening by standing at the end of each board and rolling it over the edge of the shaft onto the deck. Each plank would then be carried to the other end of the building by both men. (N.T. 209; N.T. 220; N.T. 223–24).

10. Removal of the planking from the sixth floor elevator shaft was a two man job. (N.T. 124–25; N.T. 240). Performance of the task alone, without a co-worker or "buddy", was unsafe. (N.T. 196).

11. During removal of the planking on the sixth floor, Mr. Rolf, DiSalvatore's "buddy", left the elevator shaft opening. Rolf told DiSalvatore that he would be right back and that DiSalvatore should wait until he returned to continue removing the

**1.** The parenthetical citations following each finding of fact refer to the plaintiffs' trial exhib-

its (P), defendant's trial exhibits (D) and the notes of testimony (NT).

planks. When Rolf left the elevator shaft, DiSalvatore was standing several feet away from the opening. (N.T. 209–10; N.T. 224).

12. DiSalvatore continued to remove the planking from the sixth floor elevator without his "buddy", Rolf. DiSalvatore attempted to cross the elevator shaft carrying alone one of the planks that he and Rolf together had been removing. This attempt was unsafe. DiSalvatore lost his balance and fell with the plank down the shaft. The fall was caused by DiSalvatore's unsafe attempt to perform the job alone. (N.T. 193–94; N.T. 227–36).

13. DiSalvatore fell 98′ down the open elevator pit to his death. (P. 23, part II, § II D).

14. The absence of required safety devices, *i. e.*, nets hung in the shaft or planking on the floor below, although the cause of DiSalvatore's death, did not cause DiSalvatore's fall. (N.T. 124–25).

15. DiSalvatore's employer, American Bridge, requires that removal of planking from an elevator shaft opening be performed by two workers. If one worker leaves for whatever reason, his co-worker must wait until the "buddy" comes back, according to official American Bridge policy. (N.T. 213). However, there is an unwritten rule of construction work that an employee found standing idly, even if awaiting the return of his "buddy" to continue a two-worker job, is subject to immediate dismissal. Although this rule was never stated by American Bridge, the widespread practice in the construction industry of firing on the spot a worker caught standing idly undermined the American Bridge requirement that planking from an elevator opening be removed only by two workers. (N.T. 125; N.T. 196).

### THE CONTRACTS

16. GSA and Turner Construction: The contract between GSA and Turner Construction provided that the services of the Construction Manager (Turner) be performed under the general direction of the Project Manager (GSA). GSA could, at its option, manage the project during the con-

struction phase.. (P. 40, § 1). During the construction phase, GSA had the right to:

A. Resolve any disputes in interpretation of meaning, plans and specifications (P. 40, § 5c);

B. Approve or disapprove Turner's selection of the job site staff (P. 40, § 5e);

C. Direct Turner to implement construction procedures desired by GSA (P. 40, § 5f);

D. Approve or disapprove Turner's selection of sub-contractors (P. 40, § 5i). GSA had final approval over the pay of sub-contractors (P. 40, § 5r);

E. Approve or disapprove Turner's recommendations for safety programs (P. 40, § 5l);

F. Approve or disapprove Turner's use of any outside personnel (P. 40, § 7);

G. Approve or disapprove any change by Turner in its own key personnel (P. 40, § 8);

H. Require Turner to remove from the project any person deemed incompetent by GSA (P. 40, §§ 9, 31);

I. Order that Turner's work be suspended, delayed or interrupted for such periods of time as determined to be appropriate for the convenience of GSA (P. 40, § 15; N.T. 19);

J. Serve as the final arbitrator of on-site job disputes (P. 40, § 21);

K. Require that Turner provide safety barricades, posts and planking on the job site as appropriate (P. 40, §§ 28–29);

L. Approve all payroll changes for on-site personnel (P. 40, § 30c);

M. Remove from the job site all general condition items such as safety barricades, posts and planking found to be defective at no additional cost to GSA (P. 40, § 31); and

N. Require compliance by Turner with all requirements of the GSA Accident and Fire Prevention Handbook (GSA Handbook), which was part of the contract (P. 40, § 33). GSA was responsible for ascertaining that the requirements set forth in the Handbook were being adhered to by the

contractors. If the contractors failed to comply with the Handbook requirements, GSA had the duty to notify the contractor of the violation and order that it be corrected immediately or that the work be stopped. (P. 56, § 3b).

17. GSA and Owens-Corning, Wolf & Munier: All work to be done by Owens-Corning, Wolf & Munier was under the direction of GSA (P. 41, § 2.1, general conditions). GSA had the right to:

*A.* Resolve all factual disputes involving Owens-Corning (P. 41, § 6, general provisions);

*B.* Fire any personnel on the job that GSA thought incompetent (P. 41, § 9, general provisions);

*C.* Inspect and test the work (P. 41, § 10, general provisions);

*D.* Make the contractors replace, change or correct any workmanship GSA considered unacceptable (P. 41, § 10, general provisions);

*E.* Approve or disapprove Owens-Corning's resident superintendent and foreman (P. 41, § 11, general provisions);

*F.* Suspend, delay or interrupt all or part of the work for such period as was appropriate for the convenience of GSA (P. 41, § 23, general provisions);

*G.* Compel Owens-Corning to do the work in accordance with any order issued by GSA (P. 41, § 2.2, general conditions);

*H.* Terminate the contract in whole or in part when in the interest of GSA to do so (P. 41, § 30.1, general conditions; N.T. 25);

*I.* Stop the work for failure of Owens-Corning to comply with any of the contract requirements (P. 41, § 31.1, general conditions; N.T. 26);

*J.* Compel compliance by Owens-Corning with the GSA Handbook for Accident and Fire Prevention, which was incorporated into the contract (P. 41, § 14, modification of general conditions). GSA had the responsibility for ascertaining whether Owens-Corning was adhering to the requirements set forth in the Handbook. If Owens-Corning failed to do so, GSA had the duty to notify Owens-Corning of the violation and order that the violation be corrected immediately or that work be stopped. (P. 56, § 3b).

*K.* Direct the Construction Manager (Turner) in its supervision of the Owens-Corning work (P. 41, § 4.2 special conditions);

*L.* Require compliance with all procedures set up by the Construction Manager (Turner) (P. 41, § 4.4, special conditions);

*M.* Compel access to the work for the purpose of inspection at any time (P. 41, § 5.1, special conditions);

*N.* Require defective work to be corrected to conform to the contract requirements (P. 41, § 7.2, special conditions);

*O.* Resolve any dispute between Turner and Owens-Corning on the job site (P. 41, § 18.4, special conditions);

*P.* Require that Owens-Corning provide protective equipment for workmen as provided in the Occupational Safety and Health Administration (OSHA) regulations (P. 41, § 18.1, special conditions; N.T. 251–52); and

*Q.* Set the working hours of Owens-Corning's personnel (P. 41, § 4, general conditions). GSA did not by virtue of this authority become responsible for the unspoken rule that a worker found standing idly could be dismissed immediately regardless of the reason for his inactivity.

### ROLE OF ALBERT KANDRA, GSA REPRESENTATIVE ON THE SITE

18. As Resident Engineer and government representative on the job site, Mr. Kandra was the ranking GSA employee and therefore served as general safety officer for the project. (N.T. 158–59). He had the responsibility to perform the many duties listed above, including particularly:

*A.* Resolve disputes or differences of opinion as to which contractor was responsible for the performance of specific duties on the construction site (N.T. 15; N.T. 75);

*B.* Inspect the job site during construction (N.T. 15);

*C.* Report safety violations to the violating contractor (N.T. 16–17; N.T. 61–62; N.T. 87–90).

*D.* Ascertain whether the work was being performed in compliance with GSA Handbook Safety Requirements and, if not, order that the work be suspended, delayed or interrupted (N.T. 19; N.T. 21; N.T. 27; N.T. 89; P. 40, § 15, 3a, 3b; P. 41, general conditions, sub-section 30–31);

*E.* Write to the violating contractor advising that the job would be stopped if a specific safety violation was not corrected (N.T. 69; N.T. 80);

*F.* Withhold monthly payments if a contractor was not performing in accordance with the contract requirements (N.T. 78); and

*G.* Inform the employees on the job site of the OSHA safety rules and regulations which governed this job project (N.T. 158).

19. Before DiSalvatore's accident, a dispute arose between Turner Construction and Tishman Construction over compliance with the OSHA regulations incorporated in Paragraph 18.1 of the contract between GSA and Owens-Corning. (N.T. 252). A Mr. Mitchell from Turner Construction urged Tishman Construction to take immediate steps to correct the failure to meet the OSHA requirements. Tishman failed to do so. (P. 23, part II, § III A and B; P. 23, part VI). GSA, through its representative Mr. Kandra, was aware of but did not resolve this dispute between Tishman and Turner. (P. 23, part VI, letter dated 4/11/74).

20. GSA was notified on the following dates of the absence of required protection in the elevator shaft down which DiSalvatore fell: April 11, 1974 (P. 23, part VI, letter dated 4/11/74); April 10, 1974 (P. 23, part VI, letters dated 4/10/74); March 28, 1974 (P. 23, part VI, letter dated 3/28/74; P. 23, part VI, memo dated 3/28/74); March 22, 1974 (P. 23, part VI, memo); March 21, 1974 (P. 23, part VI, written construction safety survey); March 19, 1974 (P. 23, part VI, letter from Turner Construction); March 6, 1974 (P. 23, part VI, letter sent to Turner Construction); March 5, 1974 (P. 23, part VI, memo); and February 25, 1974 (P. 23, part VI, letter).

21. Mr. Kandra, although it was his responsibility to do so, did not:

*A.* Inspect the job site during construction because he was busy with paper work in his trailer (N.T. 77; N.T. 79; N.T. 87);

*B.* Report the open freight elevator shaft to the violating contractors (P. 2; P. 3; N.T. 87);

*C.* Stop the job or withhold payment to contractors as a result of their known safety violations (N.T. 27). He did not even know that under the contract he had this authority (N.T. 17; N.T. 27; N.T. 69);

*D.* Write letters to violating contractors threatening to stop the job (P. 23, part VI);

*E.* Inform others on the job site of the safety rules and regulations which govern the project. He did not even know the contents of these regulations, although they were available in his office and part of his records. Instead, he relied on the contractors and sub-contractors to be familiar with these rules (N.T. 81; N.T. 95; N.T. 97); or

*F.* Read the GSA contracts and know his responsibilities as set forth therein (N.T. 25).

## II. DISCUSSION

Defendant argues, *inter alia*, that it has incurred no liability under the Federal Tort Claims Act because: (a) the negligence with which plaintiff charges GSA was not the cause in fact of DiSalvatore's accident under controlling law; and (b) DiSalvatore was contributorily negligent and is thus barred from any recovery under applicable tort principles. Because I must agree with these two contentions, I will here discuss only cause and contributory negligence and will express no conclusion concerning the many other issues raised by the above facts.

### A. Cause

Pennsylvania law governs the substantive issues of liability in this action. 28 U.S.C. § 1346(b). The leading Pennsylvania case

on causation in an accidental fall is *Barber v. John C. Kohler Co.,* 428 Pa. 219, 237 A.2d 224 (1968). Plaintiff in *Barber,* while working on a scaffold three feet above the ground, fell into an open hole sixteen feet deep. He alleged that defendant was negligent in failing to cover the hole. The Pennsylvania Supreme Court, affirming the lower court's dismissal of plaintiff's suit for failure to establish cause, held that "while appellant may have sustained greater injuries by falling to the bottom of the hole than he would have received had the hole been covered, that has no bearing on *the cause of the fall* . . . . [I]t is clear that appellee was not *the cause of the fall.* . . . [T]he extent of the injuries is irrelevant to a determination of the *cause of the accident.*" 428 Pa. at 221–22, 237 A.2d at 225. (emphasis supplied). *Cf. Colosimo v. May Department Store Co.,* 466 F.2d 1234 (3d Cir. 1972) (Hastie, J., concurring) (summarizing *Barber* holding).

██ Under the rule of causation stated in *Barber,* the relevant determination is the cause of *decedent's fall,* not *decedent's injury.* DiSalvatore's *fall* was caused by his attempt to perform alone the two man task of removing the sixth floor elevator shaft planking, not by defendant's allegedly negligent failure to provide either a safety net or planking on the fifth floor opening. Finding of Fact No. 12; Finding of Fact No. 14. One of the frustrations encountered in the mandatory application of state law is its stultifying effect on federal judges. The rationale of the Pennsylvania Supreme Court in *Barber* is, to my mind, sophomoric and logically indefensible. And yet, despite my own convictions, I am bound by its holding. It follows that under Pennsylvania law, I must conclude that plaintiffs have failed to prove the necessary causal connection between any negligence of defendant and the accident.

### B. Contributory Negligence

██ A second reason that defendant is entitled to judgment is DiSalvatore's contributory negligence. Because this accident occurred in 1974, two years before the ef-fective date of Pennsylvania's comparative negligence statute, the action is governed by traditional rules of contributory negligence. DiSalvatore's attempt to perform alone the two-person task of removing the planking from the sixth floor elevator shaft was unsafe and the cause of his fall. Finding of Fact No. 10; Finding of Fact No. 12. Accordingly, DiSalvatore was contributorily negligent and plaintiffs are totally barred from recovery.

Plaintiffs contend that the unspoken policy of immediately dismissing a construction worker found standing idle compelled decedent to perform the unsafe task of removing alone the sixth floor planking and therefore absolves him of contributory negligence. Finding of Fact No. 15. Whatever estoppel effect that compulsion may have in a suit against American Bridge, an issue on which I express no opinion, defendant United States was not responsible for the unwritten dismissal policy and is not precluded from raising successfully the contributory negligence defense. Finding of Fact No. 17Q.

██ The tragic circumstances of DiSalvatore's death make this conclusion a most difficult one to reach. Nonetheless, "motives of commiseration, from whatever source they follow, must not mingle in the administration of justice. Judges, in the exercise of their functions, have frequent occasion to exclaim, 'durum valde durum, sed sic lex est.'" *Penhallow v. Doane's Adm'rs,* 3 U.S. (Dall.) 54, 88–89, 1 L.Ed. 507, 521–22 (1795).

### CONCLUSIONS OF LAW

1. I have jurisdiction over this case by virtue of the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

2. Pennsylvania law governs the substantive issues of liability in this action. 28 U.S.C. § 1346(b).

3. Under Pennsylvania law, defendant's alleged negligence was not the cause of Michael DiSalvatore's fall and the United States is therefore not liable for any of DiSalvatore's injuries.

4. Under the law of Pennsylvania, DiSalvatore was contributorily negligent for continuing work without his "buddy" and plaintiffs therefore cannot recover from this defendant.

5. The United States is entitled to judgment in its favor.